**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**


| | |
|---|---|
| **KIRTI MEHTA, KEVAL MEHTA, APRIL MEHTA, KISHAN MEHTA, and KETAN MEHTA,**　　　　　) ) ) ) | |
| 　　　　　　　　) | |
| 　　　　**Plaintiffs,**　　) | |
| 　　　　　　　　) | |
| 　　　　**vs.**　　　　　) | **Case No. 12 C 6216** |
| 　　　　　　　　) | |
| **VILLAGE OF BOLINGBROOK, et al,**　) | |
| 　　　　　　　　) | |
| 　　　　**Defendants.**　　) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY, District Judge:

Kirti Mehta and his children, Keval, April, Kishan, and Ketan—who, for ease of understanding, the Court will refer to by their first names—have sued the Village of Bolingbrook along with several members of the Bolingbrook Police Department. The Mehtas allege that the Village and Bolingbrook police systematically discriminated against them on the basis of religion and national origin, depriving them of the equal protection of the law guaranteed under the Fourteenth Amendment (count 1) and interfering with their property rights under the Fair Housing Act (FHA), 42 U.S.C. § 3617 (count 2), and the Constitution (count 3).

Defendants have moved for summary judgment on all of the Mehtas' claims. For the reasons stated below, the Court denies defendants' motion.

### Background

The following facts are undisputed except where otherwise noted. Kirti Mehta

and his four children, Keval, April, Kishan, and Ketan, are Hindu Asian-Americans of Indian descent. Kirti has continuously resided in the Beaconridge development of the Village of Bolingbrook since 1996, and his children have lived with him at various times over the last twenty years. Kirti's son Kishan and daughter April lived with their father in Bolingbrook until 2014. Kirti's son Keval lived in Bolingbrook with his father until at least 2013 and testified in May 2014 that he currently lived there. Kirti's son Ketan did not live in Bolingbrook between 2009 and 2014, but he has lived there since 2014 and testified to having lived there for many years before 2009.

Until at least December 2010, the Mehtas who were residing in Bolingbrook lived in a house at 405 Yorkshire Square. When the Mehtas' home was foreclosed upon that month, they moved two doors down to 409 Yorkshire Square. The parties dispute whether all of the Mehtas ever lived at 405 Yorkshire and whether the Mehtas fully abandoned that property after the foreclosure. Although defendants contend Ketan never lived at 405 Yorkshire, Ketan testified to having lived there from 1995 through 2009, when he moved to Lisle, Illinois. Defendants also contend that the Mehtas vacated 405 Yorkshire at the time of foreclosure, but Keval testified that he was living in both residences in May 2011.

According to the Mehtas, the Bolingbrook police began routinely harassing them almost as soon as they moved into the Village. Kirti testified that he believed the Village began working to force the family out of Beaconridge in 1996. Kishan, Keval, and April also testified that they believed the Village had long been plotting to get their family to move from Bolingbrook. Keval testified that as early as December 2001, Bolingbrook police officers routinely stopped him without cause and referred to him by derogatory

ethnic slurs like "sand nigger" and "sand cricket."  He also testified that Tom Ross, then
an officer with the Bolingbrook Police Department, referred to him as a "sand cricket"
and asked him when he was going to leave Bolingbrook.

Kishan, Ketan, and April also testified that members of the Bolingbrook Police
Department harassed them on numerous occasions over the years.  Kishan testified
that in 2009, a Bolingbrook police officer twice stopped him without cause, interrogated
him, called him a "sand nigger," threatened to arrest him without cause, and asked him
when he was leaving Bolingbrook, telling him "we don't want you here."  On other
occasions (specific details of which he could not remember), Kishan testified that other
officers offensively referred to him as "Hindu," "sand nigger," and "dot head," and
Kishan stated that officer Vince Radaker asked him on numerous occasions when he
was going to leave Bolingbrook.  Ketan testified that Radaker called him "sand nigger"
and "haji" in 2006.  April testified that police stopped her without cause twice in 2009.
The first time, said April, the officer explained that she was searching the car in which
April was a passenger because "Hindus are all hippies and we know all hippies have
drugs."  The second time, two officers allegedly stopped her and Ketan outside a retail
store and referred to them as "Hindus" and "dot heads."  April also testified that groups
of police routinely harassed and searched her when she worked at a bar in
Beaconridge, and that on at least one occasion she heard officers refer to her as a
"Hindu bitch."

Shortly after midnight on August 19, 2010, during a gathering at the Mehtas'
residence at 405 Yorkshire, a man approached the property and fired multiple gunshots
in the direction of the residence.  Numerous people were standing in front of the Mehtas'

home at the time of the shooting, including Keval and Kishan. Kirti was inside and did not witness the shooting, and although Keval was outside, he did not see the shooter. Kishan saw the shooter, who was wearing a bandana mask that covered the bottom half of his face. Kishan also testified that he observed the shooter to have black hair and tan skin.

Thomas McAuliffe and at least four other Bolingbrook police officers, including a K-9 officer, arrived at the scene a short time later. When they arrived, they ordered those present to the ground, restraining and searching them to determine whether any of them had a firearm. Kishan testified that the five officers dispatched to the Mehta residence lined everyone up, searched them, and questioned them. According to Kishan, the officers yelled at everyone, accused them of lying to the police, insinuated that they perpetrated the crime, and demanded to see the firearms they likely used to fire back at their alleged assailant. Kishan also testified that when he spit to clear his sinuses at one point during the officers' questioning, a K-9 officer said, "You spit again, I'm going to arrest you for assault on an officer with bodily fluids and I'll have my dog attack you." Pls.' Ex. 7, dkt. no. 239-7, at 8 (34:8–10). Defendants deny that this occurred.

The investigation that ensued was, in the Mehtas' eyes, wholly inadequate. The parties dispute whether the Bolingbrook police department included the incident in a "notables" e-mail to apprise officers starting a new shift that an event of importance occurred during the previous shift. Ross testified that such an e-mail was sent, but it was never produced for plaintiffs despite discovery requests, and defendants now contend the e-mail does not exist. Kishan testified that he gave officers a description of

the person who attacked the house and later told them his friends had heard that a person nicknamed "Ghost" had been boasting about the shooting. Still, plaintiffs say, police did not interview other eyewitnesses. Although, according to plaintiffs, the police settled on a suspect, they never questioned that suspect and never conducted a lineup so that the people who had been outside the Mehtas' house on the night of the shooting could attempt to identify the culprit. Officers did, however, compare the bullets fired with a gun used in another shooting a few months prior in hopes that they could determine whether the two crimes were related.

Keval and Kishan claim they were subject to additional baseless stops and seizures the following month. Keval testified that in September 2010, he was pulled over without cause and detained by police for over an hour and a half. He also claims that on a separate occasion, police arrested him on baseless assault charges and asked him, "When are you going to get the hell out of Bolingbrook?" Kishan testified that he was stopped and searched on multiple occasions while exercising on foot. April testified that a few months later, officer Patrick Kinsella stopped her without cause and asked her why she and her family had not yet moved away.

In May 2011, a gunman again fired shots at 405 Yorkshire. The property had been foreclosed upon, and the Mehtas had moved two doors down by this time. Keval testified that he was living in both residences in May 2011 but that he kept most of his possessions at the new residence and was not at 405 Yorkshire at the time of the shooting. Again the Mehtas were dissatisfied with the way the police handled the incident. When Sean Talbot, the detective assigned to investigate the case, learned that another shooting had occurred at the same address nine months earlier, he did not

study that shooting or examine the incident report police produced in its wake. Officers made no attempt to compare the bullets from the second shooting with the bullets from the first, and they conducted no lineup and interviewed no suspect.

Also in May 2011, Keval submitted a child visitation interference report to the Bolingbrook Police Department. The report was not submitted to the Will County State's Attorney's Office until over a year later, and no action was ever taken on it. Defendants could not explain why the report was not referred to the State's Attorney earlier, but Talbot testified that the State's Attorney has a policy of not bringing charges for complaints like these. Ross testified that the reason no action was taken was that the report lacked a visitation order, an assertion the Mehtas dispute based on the visitation order contained in the record.

Keval and Kishan testified that an officer spotted them leaving a retail store in June 2011 and followed them home. They testified that Radaker, who allegedly stopped and harassed Ketan five years earlier, pulled them over and asked them if they were "going to move out any time soon." In his deposition, Kishan struggled to recall the details of the stop, first testifying that it occurred in 2010 and later testifying that it occurred in May 2011.

Kirti received a code violation notice from Bolingbrook Code Enforcement Officer Randy Kainrath on August 31, 2011. The notice cited Kirti for having an unrepaired fence and overgrown grass at 405 Yorkshire. Kirti testified that his fence was not broken and his grass was not overgrown at the time. He claimed to have pictures proving as much, but he did not produce these photographs during discovery.

In March 2014, Radaker again stopped two of the Mehtas, this time Kishan and

Ketan. Officer Brant Duvall was also involved in the stop. The basis of the stop was a missing license plate light bulb, but Kishan testified that the bulb was not in fact missing or broken. Kishan was on parole at the time, but Ketan was not. Ketan testified that Duvall used racial slurs while searching him, calling him a "Haji" and accusing him of possessing drugs. After failing to find any drugs or contraband on his person, Radaker and Duvall issued a warning for the purportedly broken bulb and sent Ketan and Kishan on their way.

The Mehtas filed a *pro se* suit against the Village, Ross, and unknown officers in August 2012 alleging civil rights violations, interference with their housing rights under the FHA, infringement of their constitutionally protected property rights, and unlawful retaliation. The Court granted the Mehtas leave to amend in June 2014 so that they could include claims arising from the alleged incidents in March and April 2014, add defendants and plaintiffs they claimed were involved in those incidents, and include claims arising out of Kishan and Keval's August 2011 arrest. The Court also denied the Mehtas' request to add claims and defendants related to other earlier incidents, finding them time-barred.

The Mehtas filed an amended *pro se* complaint in June 2014. Their first amended complaint included eight claims and named the Village, Ross, Talbot, Radaker, and McAuliffe. It also named in the caption officers Andrew Sraga, Antonio Tucker, Joseph Hilbruner, Joseph Poradyla, Thomas Gallas, and Richard Burdett. The Court reviewed the narrative description of incidents occurring within two years of the date the lawsuit was filed (due to the two-year statute of limitations on the Mehtas' claims) and determined that the Mehtas had also named Sergeant Champ Evans and

officers Duvall, Kinsella, Christopher Kushenbach, Robert Liazuk, Steven Sinnott, Christopher Witt, and David Henzler. The Court dismissed many of these defendants on the basis that claims against them were time-barred, and it dismissed some of the claims as duplicative of others.

After the Court appointed counsel to represent the Mehtas, they filed a second amended complaint in May 2015. In it, the Mehtas asserted three claims. In count 1, brought pursuant to 42 U.S.C. § 1983, the Mehtas alleged that the Village, Ross, Radaker, McAuliffe, Burdett, and Duvall had deprived them of their Fourteenth Amendment rights to equal protection of the law. Specifically, the Mehtas alleged that the Village and Ross treated them less favorably than persons outside of their religious and ethnic group by (1) failing to properly investigate the August 2010 shooting; (2) failing to properly investigate the May 2011 shooting; and (3) failing to take action on Keval's visitation interference complaint. They also alleged that the Village and Ross advanced a policy of discriminatory harassment that led to Keval's unlawful search and seizure in September 2010, April's unlawful search and seizure in April 2011, and Kishan and Keval's unlawful search and seizure in June 2011. Ketan alleged that the policy advanced by Ross and the Village, in addition to the discriminatory actions of Radaker and Duvall, were responsible for his unlawful search and seizure in March 2014. Kishan alleged that Ross, the Village, McAuliffe, and Burdett acted with discriminatory intent and caused him to be unlawfully searched and seized in April 2014.

In count 2, the Mehtas alleged interference with their rights under the FHA, 42 U.S.C. § 3617. This claim arose out of the eight events described in count 1 and three

additional incidents:  (1) the allegedly baseless code violation notice served on Kirti

Mehta in August 2011 (against the Village and Ross); (2) Keval's September 2010

arrest (against the Village and Ross); and (3) Kishan's alleged unlawful stops and

seizures in August and September 2010 (against the Village, Ross, and Radaker).

Count 3, brought pursuant to 42 U.S.C. § 1982, alleged discriminatory interference with

the Mehtas' constitutionally guaranteed property rights.  This claim was based on the

eleven events included in Count 2.

Defendants moved for partial dismissal of the Mehtas' second amended

complaint.  The Court denied defendants' motion in October 2015, and the parties

engaged in further discovery.  Defendants have now moved for summary judgment on

all of the Mehtas' claims.

**Discussion**

Summary judgment is proper when the moving party "shows that there is no

genuine dispute as to any material fact and [that] the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  On a motion for summary judgment, the Court

draws reasonable inferences in favor of the non-moving party.  *Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986); *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016).

"Summary judgment is not appropriate 'if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party.'"  *Payne v. Pauley*, 337 F.3d 767, 770

(7th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

**A.     Equal protection claim (count 1)**

"The Equal Protection Clause of the Fourteenth Amendment commands that no

state shall 'deny to any person within its jurisdiction the equal protection of the laws.'"

*Srail v. Vill. of Lisle*, 588 F.3d 940, 943 (7th Cir. 2009) (quoting U.S. Const. amend.

XIV). "The Equal Protection Clause grants to all Americans 'the right to be free from

invidious discrimination in statutory classifications and other governmental activity.'

When a state actor turns a blind eye to the Clause's command, aggrieved parties . . .

can seek relief pursuant to 42 U.S.C. § 1983." *Nabozny v. Podlesny*, 92 F.3d 446, 453

(7th Cir. 1996) (quoting *Harris v. McRae*, 448 U.S. 297, 322 (1980)) (internal citation

omitted). The Mehtas charge that defendants denied them equal protection by

discriminating against them in the provision of government services and by targeting

them for improper searches and seizures based on their membership in protected

classes. They claim that defendants failed to adequately investigate violent crimes

against them, refused to take action when Keval filed his child visitation interference

report, and repeatedly stopped and seized them without cause, all because of their

religion and national origin.

"To show a violation of the Equal Protection Clause, plaintiffs must prove that the

defendants' actions had a discriminatory effect and were motivated by a discriminatory

purpose." *Chavez v. Ill. State Police*, 251 F.3d 612, 635–36 (7th Cir. 2001). "To prove

discriminatory effect, the plaintiffs are required to show that they are members of a

protected class, that they are otherwise similarly situated to members of the unprotected

class, and that plaintiffs were treated differently from members of the unprotected

class." *Id.* at 636. To prove discriminatory purpose, plaintiffs must show "more than . . .

intent as awareness of consequences." *McCleskey v. Kemp*, 481 U.S. 279, 298. They

must show that "the decisionmaker . . . selected or reaffirmed a particular course of

action at least in part 'because of' . . . its adverse effects upon an identifiable group.'"

*Id.* (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).  Plaintiffs bringing suit under section 1983 "can provide evidence of intentional discrimination in two different ways.  [They] may either offer direct proof of discrimination or may rely on indirect evidence using the [*McDonnell Douglas*] burden-shifting method of proof." *Hildebrandt v. Ill. Dep't of Nat. Res.*, 347 F.3d 1014, 1037–38 (7th Cir. 2003) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)) (internal citation and quotation marks omitted).

Defendants argue that the Mehtas have failed on both fronts.  They argue that the Mehtas have not adduced direct or circumstantial evidence tending to show the events giving rise to suit were motivated by discriminatory animus and that they cannot indirectly show discrimination because they have not identified similarly situated members of an unprotected class who were treated better or differently than they were. Defendants also contend that by failing to point to comparators and relying solely on inaccurate statistical data, the Mehtas have failed to adduce evidence that would permit a jury to find discriminatory effect.

As an initial matter, defendants contend that the Mehtas' equal protection claims fail as a matter of law to the extent they arise out of the defendants' alleged failure to adequately investigate or prosecute the persons responsible for the August 2010 shooting, the May 2011 shooting, and Keval's child visitation interference complaint. Citing *Rossi v. City of Chicago*, 790 F.3d 729 (7th Cir. 2015), defendants argue that the Mehtas "do[] not have a constitutional right to have the police investigate [their] case at all, still less to do so to [their] level of satisfaction," and that "mere inactivity by police does not give rise to a constitutional claim."  *Rossi*, 790 F.3d at 735.  But *Rossi*

concerned a plaintiff's due process claim that defendants violated his right to judicial access, a claim that is plainly invalid due to the fact that "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *S. v. D.*, 410 U.S. 614, 619 (1973); *see also DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989). This case, by contrast, concerns equal protection claims that police selectively withheld services to the Mehtas because they are Hindu Asian-Americans. "Because the Equal Protection Clause is concerned with equal treatment rather than with establishing entitlements to some minimum of government services, it does not entitle a person to adequate, or indeed to any, police protection." *McCauley v. City of Chicago*, 671 F.3d 611, 618 (7th Cir. 2011) (internal quotation marks omitted). But "selective withdrawal of police protection, as when the Southern states during the Reconstruction era refused to give police protection to their black citizens, is the prototypical denial of equal protection." *Id.* (internal quotation marks omitted); *Hilton v. City of Wheeling*, 209 F.3d 1005, 1007 (7th Cir. 2000).

Defendants make much of the fact that the Mehtas have not identified similarly situated persons in an unprotected class who were treated more favorably than they were. As explained above, however, comparators are necessary to show discriminatory purpose only if a plaintiff attempts to make her case by way of the indirect method of proof. Where, viewed in the light most favorable to the nonmoving party, a mosaic of direct and circumstantial evidence permits the reasonable inference that the plaintiff's protected characteristic motivated the defendant's actions, the plaintiff can withstand summary judgment on the issue of discriminatory purpose. Likewise, although plaintiffs may show discriminatory effect by naming similarly situated individuals, they are not

required to do so.  They may also show discriminatory effect "through the use of statistics."  *Chavez*, 251 F.3d at 636.  The Mehtas concede that they have not identified individual comparators, and they seek to prove neither discriminatory purpose by the indirect method nor discriminatory effect by use of individual comparators.  The issue, then, is whether direct or circumstantial evidence permits the reasonable inference that defendants acted with discriminatory intent and whether the Mehtas' statistical evidence permits the reasonable inference that defendants' actions had a discriminatory effect.

Defendants argue that the Mehtas have adduced no competent evidence of discriminatory effect because the statistical evidence they have presented "does not track stops by religion, so the statistics do nothing to support Plaintiffs' claims that similarly-situated individuals outside of their religious minority class were treated more favorably."  Defs.' Mem., dkt. no. 226, at 17.  Defendants also contend that Ross's testimony proves that "the statistics compiled by the State of Illinois were incorrect in 2010 and 2011" and should therefore be disregarded.  *Id.* at 17–18.

Neither of these arguments carries the day.  The statistical data presented offers insight into the effect of police policy and procedure conducting traffic stops.  The data shows that in 2010 and 2011, the Bolingbrook Police were approximately 50% more likely to stop minority drivers than they were to stop white drivers when making traffic stops.  Although it does not specifically reference the drivers' religion, it need not do so—the Mehtas are non-Caucasian, and have produced evidence that non-Caucasians were significantly more likely to be subject to traffic stops in Bolingbrook in 2010 and 2011.  A jury could conclude, based on these statistics, that Bolingbrook police conduct their law enforcement duties differently when confronted with members of racial, ethnic,

and religious minorities. Furthermore, although Ross contended that the 2010 and 2011 statistics were tabulated using faulty data, this is an issue of weight, not admissibility. A jury might credit Ross's testimony and determine that the statistical data does not reliably show a discriminatory effect, and it might not.

The record contains evidence that would permit a reasonable jury to conclude that officers were unusually aggressive toward the Mehtas when they arrived to investigate the August 2010 shooting and that they decided to investigate the crime differently or less aggressively than they ordinarily would. Ross testified that officers secured the scene of the shooting in August 2010 pursuant to standard police procedure. As the Mehtas point out, however, Ross also stated that the procedures followed were not standard for all shootings, but were rather, in his estimation, standard "based on the circumstances of that shooting incident, including the fact that the incident occurred around midnight, in a townhome area with a dense population, and at a residence known to be associated with gang activity." Defs.' Ex. L, dkt. no. 227-12, ¶ 4. Keval, the only plaintiff whom defendants contend was involved in gang activity at any time, testified that he ceased his gang involvement five years before the shooting incident. Ross's testimony also does not show that police indisputably followed standard procedure, because the record contains evidence that in addition to securing the scene, a K-9 officer threatened to assault and unlawfully arrest Kishan.

Defendants argue that the Mehtas were treated no less sensitively than their non-Asian-American, non-Hindu guests when police arrived to investigate the August 2010 shooting. Defendants likewise argue that when they were allegedly abusive to Kishan during a traffic stop in April 2014, they were abusive to both Kishan and the

white, non-Hindu driver of the car.  These facts, defendants say, indisputably prove that they did not act with discriminatory intent.  This contention does not hold water.  For one thing, the evidence does not indisputably prove that police were hostile to both Kishan and the white, non-Hindu driver of the car during the April 2014 traffic stop.  But even if it did, that would prove little.  If, on account of the Mehtas' religion or national origin, police were unusually or unreasonably hostile and mistreated others who associated with the Mehtas, then officers acted with discriminatory purpose.  *Cf. Chavez*, 251 F.3d at 637 ("Allowing defendants to escape liability for discriminating against Hispanics simply because they occasionally mistreat white motorists would dismantle our equal protection jurisprudence.").

There are likewise genuine disputes of material fact in light of Ross's testimony, the testimony of other officers, and the testimony of the Mehtas regarding the May 2011 shooting and its investigation and the investigation of Keval's child visitation interference report.  A jury might conclude that these discrepancies and disputes should be resolved in favor of defendants.  The Court, however, cannot do so at summary judgment.  Although defendants have produced evidence that would permit the inference that police followed protocol when investigating the shootings and processing Keval's visitation interference report, plaintiffs have produced evidence that would support the opposite inference.  Departures from typical police practice and conflicting testimonies offered by investigating officers are cognizable evidence that a jury may consider when evaluating whether defendants acted with discriminatory purpose.

Contrary to defendants' assertion, the Mehtas may also point to events that predate August 2010 as evidence supporting the inference that police acted with

discriminatory intent.  Defendants urge the Court to disregard any and all conduct that allegedly occurred before August 7, 2010, because none of it is actionable in its own right in light of the two-year statute of limitations for the Mehtas' claims.  But it is well settled law that a plaintiff attempting to prove discrimination may point to words spoken or actions taken outside of the limitations period as evidence that when the defendant acted within the limitations period, it did so with discriminatory intent.  *Shanoff v. Ill. Dep't of Human Servs.*, 258 F.3d 696, 705 (7th Cir. 2001).  The Mehtas have adduced evidence—namely, their own testimony—that on numerous occasions over the fourteen years prior to the August 2010 shooting, Bolingbrook police officers called them derogatory names, used ethnic slurs when seizing and searching them without cause, and referenced the Mehtas' religion while saying they wanted the Mehtas out of Bolingbrook.  The Mehtas do not need to be able to file suit based on these incidents to cite them as evidence that later incidents were motivated by discriminatory animus.

Finally, defendants argue that the Mehtas have failed to adduce evidence that defendants acted with a discriminatory purpose in effectuating their traffic stops.  First, they argue that there is "no evidence," other than the testimony of the plaintiffs themselves, that Keval was unlawfully stopped in September 2010 or that Keval and Kishan were unlawfully stopped in June 2011.  Defendants acknowledge that Keval and Kishan testified that these stops took place, but defendants nonetheless contend that no reasonable jury could so find because Bolingbrook has no documentation confirming that these stops occurred.  Second, defendants contend that there is no dispute that their March 2014 stop and seizure of Ketan was effectuated without any discriminatory purpose, because Ketan testified that he did not believe at the time he was seized that

police seized him based on his race or religion.

Neither argument has merit. First, testimony, even without corroborating documentary evidence to support it, is evidence nonetheless; indeed, defendants themselves set forth police practices and procedures by reference not to documentation produced and maintained by the Village of Bolingbrook, but by Ross's uncorroborated testimony. Defendants do not explain why the Court should deem unassailable Ross's testimony as to undocumented police procedures but should disregard the Mehtas' accounts of negative or hostile interactions with police because the police department either did not generate or did not preserve documentation of the events in question. Second, testimony by one person regarding his belief concerning the motivation of another person likely is not even admissible, let alone controlling. The Court notes that in any event, Ketan Mehta testified that although he did not initially believe that officers stopped him because of his race or religion, his understanding changed when they began using racial slurs.

In addition to the numerous run-ins with police the Mehtas claim occurred more than two years before they filed suit, Ketan testified that when he and Kishan were stopped in March 2014, Duval called him a "Haji" while baselessly accusing him of possessing marijuana. The Mehtas have adduced evidence that the Village provided contradictory and unbelievable explanations for using the procedures they followed to investigate the two shootings and process Keval's child visitation interference report, arguing that a reasonable jury could find that these explanations are flimsy because they are pretextual. All of this together is sufficient to withstand summary judgment on the question of discriminatory purpose.

**B.  FHA claim (count 2) and 42 U.S.C. § 1982 claim (count 3)**

Section 3617 of the FHA provides that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of . . . any right granted or protected by section 3603, 3604, 3605, or 3606 of this title."  42 U.S.C. § 3617.  Several years ago, the Department of Housing and Urban Development published its interpretation of section 3617 as prohibiting "[t]hreatening, intimidating or interfering with persons in their enjoyment of a dwelling because of the race, color, religion, sex, handicap, familial status, or national origin of such persons, or of visitors or associates of such persons."  24 C.F.R. § 100.400(c)(2).  In light of this regulation, the Seventh Circuit has held that section 3617 "can be violated even if §§ 3603–3606 are not implicated" where a defendant interferes with the plaintiff's post-purchase enjoyment of a dwelling based on the plaintiff's membership in a protected class.  *East-Miller v. Lake Cty. Highway Dep't*, 421 F.3d 558, 562 (7th Cir. 2005).

In *East-Miller*, the Seventh Circuit approved of a test comprised of four elements: to prevail on a claim under section 3617, a plaintiff must show (1) he is protected under the FHA; (2) he was engaged in the enjoyment or exercise of his FHA rights; (3) defendants were at least partly motivated by an intent to discriminate; and (4) defendants coerced, intimidated, threatened, or interfered with the plaintiff on account of his FHA-protected activity.  *Id.* at 563.  "A showing of intentional discrimination is an essential element of a § 3617 claim."  *Id.*  And the defendants' discriminatory acts must be "frequent and severe enough" to constitute "threatening, intimidating or interfering within the meaning of the statute and the regulation."  *Id.* at 564 (internal quotation marks omitted).

Defendants contend the Mehtas have failed to establish these elements in three ways. First, defendants again argue that the record lacks evidence from which a reasonable jury could conclude that the Village and its police acted with discriminatory intent. The Court disagrees. The Mehtas have adduced evidence that on several occasions over the last twenty years, police derisively referenced the Mehtas' Hindu faith and referred to them using derogatory terms and ethnic slurs, implying that they singled out the family on the basis of their religion and national origin. A jury could reasonably conclude that police acted with intent to discriminate when they stopped, searched, and harassed the Mehtas during the incidents at issue in this suit.

Second, defendants argue that plaintiffs "must prove some nexus between the alleged incidents and their rights under the FHA." Defs.' Reply, dkt. no. 252, at 17. The Mehtas object that this is not a requirement under section 3617. Indeed, defendants cite no authority for the proposition that a defendant interferes with the enjoyment of property in violation of section 3617 only by taking action directed at that property. The Court reads this challenge, however, as an assertion that the Mehtas have failed to adduce evidence to support the second element of the test set forth in *East-Miller*: that they were engaged in the enjoyment or exercise of their FHA rights.

The Mehtas have provided enough evidence to withstand summary judgment on this element of their section 3617 claim because the evidence would permit a reasonable jury to conclude that the incidents alleged were all part of a concerted effort to intimidate the Mehtas into abandoning their property in Beaconridge. According to the Mehtas, on multiple occasions both before and after August 2010, Bolingbrook police directly said that they wanted the Mehtas out of Bolingbrook. Were a jury to

19

believe the Mehtas' testimony and find that police were actively working to uproot them, it could reasonably find that the alleged pattern of harsh treatment, selective enforcement of traffic and municipal regulations, and targeting of the Mehtas was designed to, and did, deprive the Mehtas of their right to enjoy their property in Bolingbrook.

Third, defendants contend that even if the evidence shows that, with discriminatory intent, they adversely affected the Mehtas' enjoyment of their property rights under the FHA, the incidents alleged are not severe enough to constitute interference under section 3617. Citing *Krieman v. Crystal Lake Apartments Ltd. Partnership*, No. 05 C 348, 2006 WL 1519320, at *10 (N.D. Ill. May 31, 2006), defendants contend that even if a jury were to believe that every allegation the Mehtas leveled against defendants were true, defendants' acts were too mild to truly threaten, coerce, or interfere with the Mehtas' enjoyment of their property.

This argument appears to be premised on a misreading of *Krieman*. On reply, defendants argue that the court in *Krieman* found defendants' actions insufficiently egregious even though they had engaged in behavior "including detonating explosives, burning a cross in plaintiff's yard, and breaking windows of plaintiff's home." Defs.' Reply, dkt. no. 252, at 18. These, however, are not the facts of *Krieman*; they are the facts of cases referenced in *Krieman* in which other courts in this district (including the undersigned judge) found defendants' behavior *was* sufficiently egregious to constitute interference with plaintiffs' enjoyment of their FHA rights. *See Krieman*, 2006 WL 1519320, at *10 (citing *Whisby-Myers v. Kiekenapp*, 293 F. Supp. 2d 845 (N.D. Ill. 2003) and *Johnson v. Smith*, 810 F. Supp. 235 (N.D. Ill. 1992)). By contrast, the

plaintiffs in *Krieman* alleged "three main acts" by the defendant "that interfered with their enjoyment of their housing: she attempted to require a credit check in 2001 but did not succeed, she did not take steps to stop the eviction in 2001 which was later settled, and she delayed maintenance requests in 2002." *Krieman*, 2006 WL 1519320, at *10.

This case does not present as clear a case of egregiousness as did *Whisby-Myers* or *Johnson*. But if the Mehtas can prove what they allege, this case is far different from what was at issue in *Krieman* and *East-Miller*, in which the Seventh Circuit "question[ed] whether the [defendant's] actions . . . were frequent and severe enough to give rise to an FHA claim" where the plaintiff alleged her mailbox had been damaged by snow plows and highway department trucks intentionally shined their headlights into her house. The Mehtas have adduced evidence from which a reasonable jury could conclude police routinely stopped and searched them without cause, cited them for violations they had not committed, and provided fewer government services to the Mehtas because of their religion and national origin, in an expressly communicated effort to make life in Bolingbrook unlivable for the Mehtas. If believed by a jury, this would be sufficient to constitute coercion, intimidation, or interference with FHA-protected rights.

Defendants argue that even if the Mehtas have successfully adduced evidence supporting each element of an FHA claim, their FHA claim fails as a matter of law because it is time-barred. Defendants contend that the Mehtas knew or should have known that they had a claim against defendants well before August 7, 2010, two years before the suit was filed, and their FHA claims arising out of later incidents are therefore barred. This is incorrect. Defendants' argument would require an FHA plaintiff to bring

suit within two years of a defendant's first-ever actionable attempt to intimidate, coerce, or interfere with her property rights or risk being barred from bringing suit in the future, even if future efforts are totally distinct from and more egregious or obvious than earlier ones. Whether the Mehtas could have sued for a violation of the FHA based on earlier attempts to intimidate them into leaving the Village has nothing to do with whether they have FHA claims based on later attempts to do the same. Every event for which the Mehtas seek recompense occurred after August 7, 2010, so their FHA claim is not time-barred.

Finally, defendants seek summary judgment on count 3, the Mehtas' claim under 42 U.S.C. § 1982, "for all the reasons set forth" for summary judgment on count 2. For all the reasons set forth in this section, the Court concludes that defendants are not entitled to summary judgment on count 3.

## C.    Qualified immunity

Defendants next contend that summary judgment must be entered in their favor on all claims against the named individual defendants based on qualified immunity. Determination of whether a defendant is entitled to qualified immunity involves a two-part inquiry: "(1) whether the facts alleged, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right; and (2) whether the right was clearly established at the time of its alleged violation." *Becker v. Elfreich*, 821 F.3d 920, 925 (7th Cir. 2016) (internal quotation marks omitted). "A right is clearly established when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Levin v. Madigan*, 692 F.3d 607, 622 (7th Cir. 2012)

22

(internal quotation marks omitted).

In addition to reiterating that the evidence does not permit the reasonable inference that discrimination occurred, defendants argue that even searches and seizures made with a discriminatory purpose and causing discriminatory effects are not equal protection violations unless the evidence shows the individual defendants acted "with malice." Defendants argue that "[t]here has been no showing of malice for any of the individual defendants, but especially those that [the Mehtas] waived their rights to depose: Defendants Burdett, McAuliffe, Sraga, and Duvall." Defs.' Mem., dkt. no. 226, at 26. Defendants further contend that the Mehtas "have failed part two of the test" for qualified immunity, that the right they claim was violated was "clearly established" at the time.

Defendants' argument is plainly without merit. The test for qualified immunity does not require or permit a court, on a summary judgment motion, to take as true a defendant's version of the events. As explained above, considering the evidence in the light most favorable to the Mehtas and drawing reasonable inferences in their favor, the record would permit a reasonable jury to conclude that defendants unlawfully stopped and seized the Mehta children without cause. A jury likewise could reasonably conclude that the Bolingbrook police who stopped, searched, and harassed the Mehtas did so for a discriminatory purpose and that these unlawful acts had a discriminatory effect illustrated by statistical data showing minority drivers were far more likely to be stopped by Bolingbrook police than were Caucasian drivers and by the evidence regarding ethnic slurs. Finally, it has been clearly established for decades that selectively enforcing the law against individuals based on their national origin or religion,

failing to provide services or protect such people from harm, and targeting such people for stops and seizures without cause violates clearly established rights under the Fourteenth Amendment.  Defendants do not have a viable argument for qualified immunity on summary judgment.

### D.	Liability of the Village under *Monell*

Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), "[a] government entity can be held liable under § 1983 when the execution of a government policy or custom is deemed to inflict an injury on a plaintiff.  But a municipality cannot be held liable solely on the grounds of *respondeat superior*."  *Rossi*, 790 F.3d at 737 (internal citation omitted).  As the Seventh Circuit has explained,

> The Supreme Court has recognized three particular grounds on which a municipality can be held liable under § 1983.  There must be:  (1) an express policy that would cause a constitutional deprivation if enforced; (2) a common practice that is so widespread and well-settled that it constitutes a custom or usage with the force of law even though it is not authorized by written law or express policy; or (3) an allegation that a person with final policy-making authority caused a constitutional injury.

*Id*.  The Village contends that the Mehtas have failed to adduce evidence that supports any of these three bases for municipal liability.  It accordingly asks the Court to grant summary judgment in its favor on all counts.

The Village is not entitled summary judgment on count 2.  Sections 1982 and 1983 were established through the Civil Rights Act of 1871, which the Supreme Court explained in *Monell* was not intended to impose new obligations on municipalities.  The Court held that although the Civil Rights Act eschewed traditional vicarious liability principles for municipalities, a plaintiff could bring suit against municipalities for constitutional injuries suffered as a result of a widespread policy or practice or where

the municipality's final policy-maker caused the injury. The Mehtas have brought their FHA claim not pursuant to section 1983, but rather 42 U.S.C. § 3613, which provides a private right of action to enforce FHA violations. Because Congress has not signaled that section 3613 should be unenforceable under traditional vicarious liability principles, *Monell* is not applicable to count 2. The Village cites no authority suggesting otherwise.

Even if *Monell* did apply to count 2, the Mehtas have adduced sufficient evidence to withstand the Village's request for summary judgment. "[I]t is enough that a plaintiff present competent evidence tending to show a general pattern of repeated behavior (*i.e.*, something greater than a mere isolated event)." *Davis v. Carter*, 452 F.3d 686. Defendants cite *Wilson v. Cook County*, 742 F.3d 775 (7th Cir. 2014), for the contention that although there are not "any bright-line rules for establishing what constitutes a widespread custom or practice, it is clear that a single incident—or even three incidents—do not suffice." *Id.* at 780. Defendants also contend that it is impossible to show a widespread policy or practice based on the Mehtas' mistreatment alone. According to defendants, the Mehtas would need to point to at least one other Hindu or Asian-American person who was mistreated in similar ways in order to prevail on their constitutional claims.

The Seventh Circuit has explained:

The usual way in which an unconstitutional policy is inferred, in the absence of direct evidence, is by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate officers.

*Jackson v. Marion Cty.*, 66 F.3d 151, 152 (7th Cir. 1995). The Mehtas have alleged that they were harassed, demeaned, and mistreated in similar ways at least ten times after

August 2010 and numerous times before that as well. They have presented evidence that non-white persons in the Village are significantly more likely to be subject to traffic stops and that multiple members of the police force used similar ethnic slurs against them and repeated the same refrain to them time and again: that it was high time for them to "get the hell out" of Bolingbrook. Even without identifying specific other Hindu or Asian-American persons who suffered similar treatment, the Mehtas have adduced sufficient evidence for a jury to reasonably conclude that their treatment was the result of "a common practice that is so widespread and well-settled that it constitutes a custom or usage with the force of law even though it is not authorized by written law or express policy." *Rossi*, 790 F.3d at 737. *Monell* does not bar the Mehtas' claims against the Village.

## Conclusion

For the foregoing reasons, the Court denies defendants' motion for summary judgment [dkt. no. 226]. The case is set for a status hearing on July 27, 2016 at 1:30 p.m. The status hearing will be conducted by telephone. Plaintiffs' counsel is to get defendants' counsel on the telephone and then call chambers (312-435-5618). If it is more convenient for counsel to arrange a call-in number for the call, then they may do so, so long as they advise Judge Kennelly's chambers of the call-in information by 4:30 p.m. on July 26, 2016.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: July 25, 2016